## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **KEVIN SHAMY,** individually and on behalf of all others similarly situated, <br> ℅ DannLaw <br> 15000 Madison Avenue <br> Lakewood, OH 44107 <br><br> Plaintiffs, <br><br> v. <br><br> **BITCOIN DEPOT, INC.** <br> ℅ Brandon Mintz, CEO <br> 3343 Peachtree Road NE, Suite 750 <br> Atlanta, GA 30326 <br><br> AND <br><br> **BITCOIN DEPOT OPERATING, LLC (D/B/A BITCOIN DEPOT),** <br> ℅ Cogency Global, Inc., Registered Agent <br> 115 North Calhoun Street, Suite 4 <br> Tallahassee, FL 32301 <br><br> Defendants. | Case No. <br><br> Judge <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **JURY DEMAND ENDORSED HEREON** |

Plaintiff Kevin Shamy, individually and on behalf of all others similarly situated, brings this Class Action Complaint for Damages against Defendants Bitcoin Depot, Inc. and Bitcoin Depot Operating, LLC (d/b/a Bitcoin Depot). Plaintiff makes these allegations with personal knowledge with respect to himself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, as follows:

## SUMMARY OF CASE

1.  This action seeks to hold Bitcoin Depot accountable for systematically facilitating cryptocurrency scams through its Bitcoin ATM network, particularly targeting vulnerable consumers who, when manipulated into states of panic and urgency by fraudsters claiming identity theft or other emergencies, lose thousands of dollars through Bitcoin Depot's machines.

2.  Plaintiff, a 59-year-old, lost $18,100 when a scammer impersonating a PayPal representative coerced him into depositing cash at a Bitcoin Depot ATM, claiming his identity had been stolen and was being used in various places. Despite obvious red flags—a first-time user making two large transactions totaling $18,100 within two hours—Bitcoin Depot's ATM processed each transaction without intervention, taking its substantial cut before transferring the remainder to the scammer's wallet.

3.  Impersonation scams using Bitcoin ATMs have become a nationwide epidemic. Fraudsters routinely impersonate government agencies, tech companies, and law enforcement to convince victims that they must urgently deposit cash into Bitcoin ATMs to resolve fabricated emergencies involving suspicious account activity, identity theft, or money laundering. Federal Trade Commission data shows fraud losses at Bitcoin ATMs increased nearly tenfold from 2020 to 2023, topping $65 million in just the first half of 2024, with a median loss of $10,000 per victim—reflecting how these scams systematically target consumers in moments of panic and distress.[1]

4.  As one of the largest Bitcoin ATM operators in North America, Bitcoin Depot has actual knowledge that its ATMs are routinely used for these impersonation scams. The company's

---

[1] Federal Trade Commission, September 3, 2024, "FTC Data Spotlight. Bitcoin ATMs: a payment portal for scammers," www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers (last visited September 5, 2025).

own SEC filings admit its services "may be exploited to facilitate illegal activity such as fraud" and that its "risk management policies may not be sufficient."[2] Bitcoin Depot has even published articles acknowledging the widespread nature of cryptocurrency scams, describing how fraudsters use "fabricated sense of urgency, tricking you into making hasty decisions" and warning that these scams "play on your best and worst impulses" to target vulnerable consumers across all demographics.[3]

5.      Despite this knowledge—and despite publicly claiming to provide "safe and secure" Bitcoin ATM services—Bitcoin Depot prioritizes profits over protection.[4] The company charges fees up to 50% of transaction amounts, deriving substantial revenue from fraudulent transactions while implementing only ineffective on-screen warnings that demonstrably fail to prevent scams.[5]

6.      This lawsuit alleges Bitcoin Depot's conduct violates Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") through misrepresenting the security of its services and failing to implement adequate safeguards. The complaint also brings claims for, Civil Theft for the Possession of Stolen Property, Negligence, Voluntary Assumption of Duty for Bitcoin Depot's breach of its self-proclaimed commitment to customer protection, and Unjust Enrichment.

7.      Plaintiff seeks to certify a class of similarly situated victims and requests immediate return of wrongfully detained funds, injunctive relief requiring effective protective measures, and attorney fees.

---

[2] Bitcoin Depot, Inc., Form 10-Q, United States Securities and Exchange Commission, pp. 63, 67 (Sept. 30, 2023) .

[3] Bitcoin Depot, Common Crypto Scams, https://bitcoindepot.com/bitcoin-atm-info/common-crypto-scams/ (last visited September 5, 2025).

[4] Bitcoin Depot, Protecting Yourself from Bitcoin ATM Scams and Fraud, https://bitcoindepot.com/scam-fraud/ (last visited July 11, 2025).

[5] Bitcoin Depot, Terms and Conditions, https://bitcoindepot.com/terms-and-conditions/ (last visited July 11, 2025).

## PARTIES

8.      Plaintiff Kevin Shamy ("Plaintiff Shamy") is a 59-year-old Florida resident. Plaintiff had limited familiarity with cryptocurrency when he was victimized by scammers using Bitcoin Depot's ATM network on June 3, 2025, losing $18,100 in two transactions made just two hours apart. The vulnerability created by the scammer's psychological manipulation— impersonating a PayPal representative, fabricating identity theft emergencies, and maintaining constant phone contact to prevent reflection—demonstrates how these schemes exploit victims regardless of their background or profession.

9.      Defendant Bitcoin Depot, Inc. is a Delaware corporation with its principal place of business in Georgia that operates the largest cryptocurrency kiosk network in North America, claiming to operate more than 8,400 Bitcoin ATMs across the United States, Canada, and Puerto Rico.

10.     Defendant Bitcoin Depot Operating, LLC, is a foreign LLC registered to do business in Florida. As an LLC, Bitcoin Depot is considered a resident of the state of each of its members. According to public filings by Bitcoin Depot, Inc., Bitcoin Depot Operating, LLC, is a wholly owned subsidiary of BT HoldCo, LLC, of which Bitcoin Depot, Inc. is the sole managing member. Accordingly, Bitcoin Depot Operating, LLC, is considered a resident of the states of Delaware and Florida.

11.     Bitcoin Depot, Inc., and Bitcoin Depot Operating, LLC, are referred to collectively hereinafter as the "Bitcoin Depot."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the number of

members of all proposed plaintiff classes in the aggregate is 100 or more, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, minimal diversity exists because at least one member of the plaintiff class is a citizen of a state different from at least one defendant, and none of the exceptions under 28 U.S.C. § 1332(d)(4) apply to this action.

13.    This Court has personal jurisdiction over Bitcoin Depot because it conducts substantial business in Florida including:

     a.    Operating and maintaining 1,512 Bitcoin ATMs throughout Florida, generating substantial revenue from Florida residents;

     b.    Advertising its services to Florida consumers; and

     c.    Conducting the specific transactions at issue in this lawsuit with Florida resident Kevin Shamy.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to these claims occurred in Hillsborough County, Florida, where Bitcoin Depot operates ATMs and conducts regular business with Florida consumers, and because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

15.    Bitcoin Depot purposefully availed itself of Florida's market and legal protections by establishing a comprehensive network of ATMs throughout the state, making it subject to Florida's jurisdiction and consumer protection laws.

16.    This Court has supplemental jurisdiction over any state law claims that do not independently satisfy CAFA's requirements pursuant to 28 U.S.C. § 1367(a) because such claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## ALLEGATIONS

**A.  Bitcoin Depot's Business Model and Services**

17.    Bitcoin Depot operates one of the largest cryptocurrency kiosk networks in North America, claiming to operate more than 8,400 Bitcoin ATMs across the United States, Canada, and Puerto Rico. In Florida alone, Bitcoin Depot operates at least 1,512 ATMs.

18.    Bitcoin Depot strategically places its ATMs in high-traffic retail locations through partnership contracts with national, regional, and independent convenience stores, grocery stores, liquor stores, and gas stations, maximizing accessibility to cash-carrying consumers.

19.    Bitcoin ATMs are self-service kiosks that convert cash directly into Bitcoin cryptocurrency. The machines resemble traditional ATMs with a touchscreen display, keypad, bill acceptor slot for cash insertion, and camera to scan QR codes linked to Bitcoin wallets where funds are transferred.

20.    Bitcoin Depot's business model differs significantly from traditional online cryptocurrency exchanges in ways that make the ATMs particularly attractive to scammers:

a.    **Immediate cash-to-Bitcoin conversion** without requiring bank accounts or credit cards;

b.    **Instant transfers** with little or no delay after payment, unlike traditional exchanges that impose waiting periods;

c.    **Anonymous "non-custodial" wallets** brought by users or generated by the ATM, giving Bitcoin Depot no control over or knowledge of who accesses the wallet's private keys, unlike traditional exchanges that maintain control and comply with anti-money laundering regulations.

6

21.    Bitcoin Depot markets these features—speed, convenience, and anonymity—as advantages while charging substantially higher fees than traditional exchanges. For transactions involving Plaintiff, Bitcoin Depot retained approximately 25% of the cash deposited as fees before converting the remainder to Bitcoin.

22.    Under Bitcoin Depot's current terms of service published in January 2025, the company can charge fees up to 50% of the total transaction amount.[6]

23.    Bitcoin Depot's high-fee, high-volume business model generates substantial revenue from each transaction. The company announced a 25% revenue reduction in Q3 2024 compared to 2023 specifically because California legislation limited daily transactions to $1,000, demonstrating the company's dependence on high-value transactions.[7]

24.    Bitcoin Depot derives revenue not only from legitimate cryptocurrency purchases but also from fraudulent transactions, as the company retains its substantial fees regardless of whether the underlying transaction is legitimate or part of a scam targeting vulnerable consumers.

**B. The Cryptocurrency ATM Scam Epidemic**

25.    Cryptocurrency ATM scams have reached epidemic proportions nationwide, with Bitcoin ATMs serving as the primary payment method for fraudsters targeting vulnerable consumers. Federal Trade Commission data shows fraud losses at Bitcoin ATMs increased nearly tenfold from $12 million in 2020 to $114 million in 2023.[8]

---

[6] Bitcoin Depot, Terms and Conditions, https://bitcoindepot.com/terms-and-conditions/ (last visited July 11, 2025).

[7] Bitcoin Depot Reports Third Quarter 2024 Financial Results, https://ir.bitcoindepot.com/news-events/press-releases/detail/87/bitcoin-depot-reports-third-quarter-2024-financial-results (last visited July 11, 2025).

[8] Federal Trade Commission, September 3, 2024, "FTC Data Spotlight. Bitcoin ATMs: a payment portal for scammers," www.ftc.gov/news-events/data-visualizations/data-spotlight/ 2024/09/bitcoin-atms-payment-portal-scammers (last visited July 11, 2025).

26.     The median reported loss when using cryptocurrency kiosks was $10,000 in the first six months of 2024, compared to $447 in general fraud cases—demonstrating that Bitcoin ATM scams result in disproportionately devastating financial losses.[9]

27.     Elderly adults are the primary targets of Bitcoin ATM scams. People aged 60 and over were more than three times as likely as younger adults to report losses using Bitcoin ATMs, with older adults accounting for more than two-thirds of all dollars reported lost through these machines.[10]

28.     "Cryptocurrency ATM Scams" follow a predictable pattern that exploits Bitcoin ATMs' speed and anonymity features:

a.    Scammers contact victims by telephone, impersonating trusted entities including government agencies (IRS, Social Security Administration, Federal Reserve), technology companies (Microsoft, Apple), financial technology companies (PayPal), law enforcement, banks, or utility companies;

b.    Scammers create artificial urgency by claiming the victim's accounts are compromised, they face legal trouble, or immediate action is required to prevent financial loss;

c.    Scammers direct victims to withdraw cash and deposit it into Bitcoin ATMs while providing QR codes containing the scammer's wallet address;

d.    Scammers remain on the phone throughout the process, using psychological manipulation and threats to prevent victims from recognizing the fraud.

---

[9] Fed. Trade Comm'n, Protecting Older Consumers 2023-2024: A Report of the Federal Trade Commission, at 17 (Oct. 18, 2024).
[10] *Id.*

29.    Bitcoin ATMs are the scammers' preferred payment method because they offer immediate, irreversible transfers to anonymous wallets with minimal verification requirements. Traditional wire transfer services and money order systems have implemented safeguards that make Bitcoin ATMs more attractive for fraudulent schemes.

30.    The Federal Trade Commission has specifically recognized Bitcoin ATMs as "a payment portal for scammers," warning that these machines present unique risks due to their combination of cash acceptance, immediate transfers, and anonymity.[11]

31.    The cryptocurrency ATM scam epidemic represents a foreseeable and well-documented threat to consumer welfare, particularly affecting vulnerable elderly populations who are less familiar with cryptocurrency technology and more susceptible to authority-based manipulation tactics.

## C.  Bitcoin Depot's Actual Knowledge of Scam Exploitation

32.    Bitcoin Depot has actual knowledge that its ATMs are routinely exploited for cryptocurrency scams targeting elderly and vulnerable consumers. This knowledge comes from multiple sources, including government reports, industry data, direct consumer complaints, and the company's own internal admissions.

33.    In September 2023, Bitcoin Depot publicly admitted in its SEC filing that it was aware "[o]ur products and services may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams."[12]

34.    Bitcoin Depot further acknowledged in the same SEC filing that its risk management systems are inadequate: "Our risk management policies, procedures, techniques, and

---

[11] Federal Trade Commission, September 3, 2024, "FTC Data Spotlight. Bitcoin ATMs: a payment portal for scammers."
[12] Bitcoin Depot, Inc., Form 10-Q, United States Securities and Exchange Commission, p. 67 (Sept. 30, 2023).

processes may not be sufficient to identify all risks to which we are exposed, to enable us to prevent or mitigate the risks we have identified, or to identify additional risks to which we may become subject in the future."[13]

35.    Bitcoin Depot has published extensive content on its own website demonstrating comprehensive knowledge of cryptocurrency scams and their methodologies. In multiple detailed articles, Bitcoin Depot describes the precise tactics scammers use, including how they create 'fabricated sense of urgency, tricking you into making hasty decisions,'[14] how they 'play on your best and worst impulses,'[15] and how they employ 'imposter scams' where fraudsters 'pose as Bitcoin ATM operators or support personnel.'[16] The company has catalogued eight different types of Bitcoin ATM scams, including 'Federal Agency Scams' where 'scammers pretend to be federal agencies, claiming that the victim has broken certain laws or regulations while using the Bitcoin ATM.'[17] Bitcoin Depot acknowledges that while seniors may be particularly vulnerable to these scams, the psychological manipulation techniques are designed to exploit any consumer placed in a state of distress, regardless of age or background.[18]

36.    Bitcoin Depot receives direct consumer complaints documenting scam victimization through its ATM network. Recent complaints posted to Bitcoin Depot's Better Business Bureau profile include multiple reports of victims losing substantial sums to scammers:

---

[13] *Id.* at pp. 63, 67.
[14] Bitcoin Depot, Common Crypto Scams (March 10, 2025), https://bitcoindepot.com/bitcoin-atm-info/common-crypto-scams/ (last visited September 5, 2025).
[15] *Id.*
[16] Bitcoin Depot,12 Days of Bitcoin #8 - Eight Bitcoin ATM Scams (December 19, 2023), https://bitcoindepot.com/bitcoin-atm-info/12-days-of-bitcoin-8-eight-bitcoin-atm-scams/ (last visited September 8, 2025).
[17] *Id.*
[18] Bitcoin Depot, What Crypto Scams Seniors Should Watch For (May 23, 2023), https://bitcoindepot.com/bitcoin-atm-info/what-crypto-scams-seniors-should-watch-for/ (last visited September 8, 2025).

a. A complaint about a victim who deposited $9,900 into a Bitcoin Depot ATM after being scammed, with Bitcoin Depot refusing to provide a refund and stating "it was a legit deposit";[19]

b. A complaint about an elderly father who lost significant funds to scammers, with the complainant noting that Bitcoin Depot "allow[s] criminals to continue their fraudulent activities" and lacks adequate security measures;[20]

c. Multiple complaints describing elderly victims depositing tens of thousands of dollars while following telephone instructions from scammers impersonating government agencies and tech support.[21]

37. Bitcoin Depot's customer demographics demonstrate actual knowledge that elderly adults comprise its primary user base, despite the company's public claims about serving the "unbanked" and facilitating international remittances. Federal data confirms that older adults are more likely to be targeted for scams and less likely to report losses, making them attractive targets for exploitation.[22]

38. Bitcoin Depot is aware that multiple users regularly send Bitcoin to identical wallet addresses, indicating that funds are being sent to third parties rather than to wallets owned by the

---

[19] Better Business Bureau Complaint, Bitcoin Depot Operating LLC, April 16, 2025, https://www.bbb.org/us/ga/atlanta/profile/virtual-currency/bitcoin-depot-operating-llc-0443-28143445/complaints (last visited July 11, 2025).
[20] Better Business Bureau Complaint, Bitcoin Depot Operating LLC, January 22, 2025, https://www.bbb.org/us/ga/atlanta/profile/virtual-currency/bitcoin-depot-operating-llc-0443-28143445/complaints (last visited July 11, 2025).
[21] Better Business Bureau Complaints, Bitcoin Depot Operating LLC, August 22, 2024 and September 5, 2024, https://www.bbb.org/us/ga/atlanta/profile/virtual-currency/bitcoin-depot-operating-llc-0443-28143445/complaints (last visited July 11, 2025).
[22] Fed. Trade Comm'n, Protecting Older Consumers 2023-2024: A Report of the Federal Trade Commission, at 17 (Oct. 18, 2024).

users themselves—a clear violation of Bitcoin Depot's stated policies requiring users to send Bitcoin only to their own wallets.[23]

39.    Despite claiming to employ "various measures to protect [its] customers from scams and fraud" and asserting that "by taking these measures, we are able to provide our customers with a safe and secure Bitcoin ATM experience," Bitcoin Depot's own data demonstrates that its safeguards fail to prevent scam transactions, as evidenced by the continued stream of consumer complaints and the company's own admission that its risk management "may not be sufficient."[24]

40.    Bitcoin Depot CEO Brandon Mintz has stated that the company's objective is to "safely, securely, bring Bitcoin to the masses," yet the company's internal data and external reports confirm that Bitcoin Depot's ATMs are causing consumers "substantial, unavoidable injury" that far outweighs any purported consumer benefits.[25]

**D. Bitcoin Depot's Inadequate Response and Failures**

41.    Despite its actual knowledge of widespread scam exploitation, Bitcoin Depot has deliberately chosen to implement only minimal, demonstrably ineffective safeguards that prioritize transaction volume and profits over consumer protection.

42.    Bitcoin Depot's primary anti-fraud measure consists of displaying on-screen warnings and placing stickers on ATMs with messages such as "ARE YOU BEING SCAMMED?"

---

[23] Bitcoin Depot FAQ, https://bitcoindepot.com/faq/ (last visited July 11, 2025).
[24] Bitcoin Depot, Protecting Yourself from Bitcoin ATM Scams and Fraud, https://bitcoindepot.com/scam-fraud/ (last visited July 11, 2025).
[25] Crypto ATM Provider Bitcoin Depot Announces Nasdaq Listing for July 3, CRYPTOSLATE (July 2, 2023).

and "Do not buy bitcoin for IRS payments, utility bills, or if someone says you have been hacked or are being investigated. These are scams!"[26]

43.     These warning-based measures are fundamentally inadequate and Bitcoin Depot knows it. Federal Trade Commission research on scam prevention messaging demonstrates that warnings often fail because scammers disrupt victims' ability to reason, creating psychological states where victims cannot process warning information effectively.[27]

44.     Bitcoin Depot's own transaction data proves the ineffectiveness of its warnings. The continued high volume of scam transactions reported through consumer complaints and the company's own admission that it "cannot ensure" detection of illegal activity confirm that warning messages fail to prevent fraud.[28]

45.     Bitcoin Depot deliberately fails to implement meaningful transaction monitoring despite having the technological capability to do so. The company allows transactions that should trigger automatic intervention, including:

   a.  **Large cash deposits by first-time users**, particularly elderly customers exhibiting signs of distress;

   b.  **Multiple maximum-value transactions** by the same individual within short time periods;

---

[26] USA Today, "Bitcoin ATM scams targeting seniors surge. Here's how consumer advocates want to stop them" (April 21, 2025),
https://www.usatoday.com/story/money/2025/04/21/bitcoin-atm-scams-consumer-protection/83201725007/ (last visited July 11, 2025).
[27] Federal Trade Commission, "A Review of Scam Prevention Messaging Research,"
https://consumer.ftc.gov/system/files/consumer_ftc_gov/pdf/A%20Review%20of%20Scam%20
Prevention%20Messaging%20Research.pdf (last visited July 11, 2025).
[28] Bitcoin Depot, Inc., Form 10-Q, United States Securities and Exchange Commission, pp. 63, 67 (Sept. 30, 2023).

      c. **Sequential deposits to identical Bitcoin wallet addresses** from different users, indicating third-party control;

      d. **Customers visibly following telephone instructions** while struggling to complete transactions.

46.    Moreover, Bitcoin Depot has no policies specifically designed to protect consumers aged 60 or older from fraud, despite acknowledging that seniors comprise its primary user base and are "particularly vulnerable" to cryptocurrency scams. Other cryptocurrency kiosk companies have implemented elderly-specific protections that Bitcoin Depot deliberately chooses not to adopt.[29]

47.    Bitcoin Depot fails to utilize available blockchain tracking capabilities that could identify and prevent scam patterns. While every Bitcoin transaction is permanently recorded on the blockchain, Bitcoin Depot does not use this technology to detect when multiple victims send funds to the same scammer-controlled wallets.

48.    When obvious red flags occur, Bitcoin Depot's ATMs provide superficial warnings but allow customers to bypass them and complete transactions without meaningful intervention. Even when warnings are triggered, the company does not:

      a. Contact customers to verify their intentions;

      b. Implement cooling-off periods for large or suspicious transactions;

      c. Require enhanced verification for elderly or distressed users;

      d. Temporarily hold funds pending verification of transaction legitimacy.

---

[29] Bitcoin Depot, What Crypto Scams Seniors Should Watch For (May 23, 2023), https://bitcoindepot.com/bitcoin-atm-info/what-crypto-scams-seniors-should-watch-for/ (last visited July 11, 2025).

49.     Bitcoin Depot could implement but deliberately chooses not to adopt effective protective measures that would reduce scam victimization, including:

    a.  Mandatory identity verification for large transactions, particularly by elderly users;

    b.  Transaction limits and waiting periods for first-time users making substantial deposits;

    c.  Real-time customer service calls for transactions exhibiting multiple risk factors;

    d.  Enhanced monitoring systems that detect patterns consistent with scam activity.

50.     Bitcoin Depot's refusal to implement adequate safeguards is driven by economic considerations. The company understands that effective protective measures would reduce transaction volume and the substantial fees it derives from each completed transaction, regardless of legitimacy.

51.     When consumers report scam victimization and request assistance, Bitcoin Depot's customer service routinely denies relief and retains its share of the fraudulent proceeds. The company's standard response claims that Bitcoin transactions are "irreversible," while maintaining possession of the original cash deposits and refusing to return even the fees it collected.

52.     Bitcoin Depot's inadequate response creates substantial public policy harms, including: (a) enabling a business model that profits from criminal activity; (b) facilitating systematic financial abuse targeting vulnerable populations, including elderly adults, individuals with limited English proficiency, those unfamiliar with technology, and people in financial distress; (c) undermining consumer confidence in legitimate cryptocurrency services; and (d) imposing social costs through increased victimization of consumers who may be more susceptible to high-pressure tactics and psychological manipulation.

53.     The harm to consumers from Bitcoin Depot's inadequate safeguards is entirely foreseeable and substantially outweighs any purported benefits of the company's service model. Bitcoin Depot operates in conscious disregard of known risks to prioritize profits over the financial security of vulnerable elderly consumers.

### E.     Bitcoin Depot's Voluntary Assumption of Protective Duties

54.     Bitcoin Depot has voluntarily and publicly assumed a duty to protect its customers from cryptocurrency scams and fraud through extensive marketing representations, educational materials, and explicit commitments to consumer safety that go beyond mere legal compliance.

55.     Bitcoin Depot prominently represents on its website that it employs "various measures to protect [its] customers from scams and fraud," explicitly stating that "by taking these measures, we are able to provide our customers with a safe and secure Bitcoin ATM experience."[30]

56.     Bitcoin Depot CEO Brandon Mintz has publicly stated that the company's central objective is to "safely, securely, bring Bitcoin to the masses," creating reasonable consumer expectations that the company prioritizes customer protection in its operations.[31]

57.     Bitcoin Depot has published extensive educational content specifically addressing cryptocurrency scams, including a dedicated webpage titled "Protecting Yourself from Bitcoin ATM Scams and Fraud" where the company acknowledges that "these [Bitcoin] ATMs can be a target for scammers and fraudsters" and commits that "it is important to educate our customers on potential scams and fraud."[32]

---

[30] Bitcoin Depot, Protecting Yourself from Bitcoin ATM Scams and Fraud, https://bitcoindepot.com/scam-fraud/ (last visited July 11, 2025).
[31] Crypto ATM Provider Bitcoin Depot Announces Nasdaq Listing for July 3, CRYPTOSLATE (July 2, 2023)
[32] Bitcoin Depot, Protecting Yourself from Bitcoin ATM Scams and Fraud, https://bitcoindepot.com/scam-fraud/ (last visited July 11, 2025).

58.     Through its marketing materials and website content, Bitcoin Depot represents that it provides:

  a. Comprehensive scam warnings on all kiosks with information about common fraud schemes;

  b. Educational resources to help customers identify and avoid cryptocurrency scams;

  c. Readily available customer support to address questions about potential transactions;

  d. Security measures to protect Bitcoin ATMs from fraudulent use and tampering.[33]

59.     Bitcoin Depot's assumption of protective duties is particularly significant given the company's actual knowledge that vulnerable populations—including seniors and those experiencing financial distress—comprise a substantial portion of its user base and are susceptible to cryptocurrency scams. By marketing to these vulnerable populations while simultaneously acknowledging through its own publications that consumers can be exploited through psychological manipulation tactics, Bitcoin Depot voluntarily undertook enhanced responsibilities for their protection.

60.     Bitcoin Depot's public commitments created reasonable expectations among consumers—including Plaintiff and class members—that the company would exercise reasonable care to detect and prevent obvious scam scenarios, particularly those involving vulnerable customers making large, unusual transactions.

61.     Bitcoin Depot's voluntary assumption of protective duties distinguishes its legal obligations from those of passive service providers. By actively marketing safety and security as

---

[33] *Id.*

service features, the company transformed consumer protection from a regulatory requirement into a contractual commitment and competitive advantage.

62.    Bitcoin Depot's assumed duties extend beyond general legal compliance to include reasonable steps to prevent the specific types of fraud the company acknowledges are prevalent in its industry and disproportionately affect its customer base.

63.    Having voluntarily assumed these protective duties, Bitcoin Depot became legally obligated to perform them with reasonable care. The company's failure to implement adequate safeguards despite its public commitments constitutes a breach of its voluntarily assumed duties to Plaintiff and class members.

64.    Bitcoin Depot's breach of its assumed duties is particularly egregious because the company continues to market safety and security as service features while internally acknowledging that its risk management systems "may not be sufficient" to prevent the very harms it promises to address.[34]

65.    Consumers, including Plaintiff, reasonably relied on Bitcoin Depot's representations about safety and security when they were directed by scammers to use the company's ATMs. Even though victims do not typically choose which specific ATM to visit—as scammers direct them to particular locations—consumers can still reasonably expect that any ATM operator advertising robust security measures would implement basic protections against obvious fraud scenarios.

66.    Bitcoin Depot's voluntary assumption of protective duties created a special relationship with its customers that imposed heightened obligations to act reasonably to prevent

---

[34] Bitcoin Depot, Inc., Form 10-Q, United States Securities and Exchange Commission, pp. 63, 67 (Sept. 30, 2023).

foreseeable harm, particularly to vulnerable consumers who are the primary targets of cryptocurrency ATM scams.

### F. The Specific Harm to Kevin Shamy

67.    Plaintiff Kevin Shamy ("Shamy") is a 59-year-old Florida resident. Plaintiff Shamy had limited familiarity with cryptocurrency technology when he became a victim of the sophisticated fraud scheme that exploits Bitcoin Depot's inadequate safeguards.

68.    On June 3, 2025, Plaintiff Shamy received a fraudulent email claiming to be from PayPal stating he owed a bill. Following the instructions, he contacted the provided number and spoke with an individual claiming to be a PayPal representative.

69.    The scammer employed classic impersonation fraud tactics, gaining Plaintiff Shamy's trust by assuming a position of corporate authority and expertise. The scammer escalated the fraud by claiming Plaintiff Shamy's identity had been stolen and was being used fraudulently across multiple locations, even sending fabricated documentation purporting to show widespread misuse of his personal information.

70.    Using psychological manipulation and creating a fabricated crisis of identity theft, the scammer convinced Plaintiff Shamy that his financial accounts were at immediate risk. The scammer instructed Plaintiff Shamy to withdraw all cash from his accounts and deposit it into Bitcoin Depot's ATMs for "protection."

71.    On June 3, 2025, under continuing duress and believing he was protecting his finances from identity theft, Plaintiff Shamy attempted to withdraw all funds from his checking account. However, the bank would not allow him to withdraw the entire amount at once, so Plaintiff Shamy withdrew $10,000. The scammer remained on the telephone throughout, repeatedly instructing Plaintiff Shamy not to disclose the purpose of his withdrawal to bank

personnel. The scammer then directed Plaintiff Shamy to the nearest Bitcoin Depot ATM, which the scammer located online and determined was approximately 10 minutes from Plaintiff Shamy's residence, where Plaintiff Shamy made his first encounter with Bitcoin Depot's ATM network.

72.    At 2:49 PM EST on June 3, 2025, Plaintiff Shamy deposited $10,000 into the Bitcoin Depot ATM. Despite being a first-time user clearly acting under telephone instructions from an unknown party, Bitcoin Depot's ATM processed the transaction without intervention, converting the cash to Bitcoin and transferring it to the scammer's wallet address while retaining substantial fees. *See* **Exhibit 1**, Transaction Receipt, Order No. QLFHA2AK.

73.    Following that transaction, the scammer instructed Plaintiff Shamy to withdraw the remainder of his checking account—$8,100—from a different bank location. Again under telephone supervision, Plaintiff Shamy was directed to deposit this money into the same Bitcoin Depot ATM, directing the funds to the identical Bitcoin wallet. These transactions occurred only two hours apart. *See* **Exhibit 2**, Transaction Receipt, Order No. QZKEK6ZW.

74.    This pattern—a customer making two large sequential deposits totaling $18,100 to the same wallet address while following telephone instructions—presented obvious red flags that Bitcoin Depot's systems ignored.

75.    Immediately after the second transaction, Plaintiff Shamy attempted to locate the funds in his Coinbase account via the app on his phone, believing this was where his money had been transferred, but could not find them. When he expressed concern to the scammer, who was still on the phone, the man assured him the funds were secure. However, when Plaintiff Shamy pressed for answers about the missing money, the scammer abruptly terminated the call and disappeared.

76.    Plaintiff Shamy immediately attempted to contact the Ruskin (FL) Sheriff's Department, but was told there was nothing they could do and was referred to the Attorney General's office. Plaintiff Shamy was subsequently transferred between various agencies in an unsuccessful attempt to recover his stolen funds, with no agency able to provide meaningful assistance.

77.    The fraud continued to impact Plaintiff Shamy months later. On August 1, 2025, Plaintiff Shamy received a notification on his phone purportedly from the IRS stating "click here if you were a victim of a scam." When Plaintiff Shamy clicked the link, he was connected to a man who identified himself as a Bitcoin employee. This individual told Plaintiff Shamy that to recover his previously stolen money, he needed to deposit additional funds into his Coinbase account using the Coinbase app on his phone. Through this second fraud, the scammer obtained an additional $3,800 from Plaintiff Shamy.

78.    Across the initial Bitcoin Depot transactions, Bitcoin Depot retained substantial fees from Plaintiff Shamy's $18,100 in cash before transferring the remainder as Bitcoin to the scammer's wallet. Bitcoin Depot profited from Plaintiff Shamy's victimization while implementing no protective measures.

79.    Despite Plaintiff Shamy's efforts to seek assistance through various government agencies, Bitcoin Depot retained the substantial fees derived from the fraudulent transactions without providing any relief to Plaintiff Shamy.

80.    Plaintiff Shamy's experience represents a textbook case of Bitcoin Depot's systemic failures: (a) a vulnerable customer acting under psychological distress; (b) obvious signs of telephone manipulation and coercion; (c) multiple large transactions in rapid succession; (d)

deposits to a third-party wallet; (e) clear red flags ignored by inadequate safeguards; and (f) refusal to provide relief after notification of fraud.

81.     As a direct result of Bitcoin Depot's failures and the underlying fraud, Plaintiff Shamy suffered immediate financial losses of $18,100—representing a substantial portion of his savings. He also experienced significant emotional distress, ongoing vulnerability to additional fraud attempts, and the practical consequences of losing funds needed for living expenses.

82.     Plaintiff Shamy's harm was entirely preventable through reasonable safeguards that Bitcoin Depot deliberately chose not to implement. Simple protective measures—such as transaction limits for first-time users, mandatory verification for large sequential deposits, or customer service intervention for obvious red flag scenarios—would have detected and prevented this fraud.

### G. Bitcoin Depot's Retention of Stolen Funds

83.     After processing fraudulent transactions through its ATM network, Bitcoin Depot systematically retains possession of victims' stolen cash and converts it to its own use rather than returning it to victims or cooperating with law enforcement to facilitate recovery.

84.     When victims deposit cash into Bitcoin Depot ATMs under fraudulent circumstances, the physical currency remains in Bitcoin Depot's possession and control within the machine's cash storage compartments. Bitcoin Depot then transfers this cash to its own accounts as part of its regular collection and deposit procedures.

85.     Bitcoin Depot maintains a deliberate policy and practice of retaining cash deposited by scam victims even after being notified that the transactions were fraudulent. The company refuses to return stolen funds to victims based on its position that Bitcoin transactions are

"irreversible," while simultaneously maintaining possession and control of the original cash deposits.

86.    Bitcoin Depot's "irreversibility" representations are misleading and false as applied to the substantial fees it retains from each transaction. While Bitcoin cryptocurrency transfers may be irreversible, the cash fees collected by Bitcoin Depot—typically 25-50% of the total transaction amount—remain in the company's possession and are entirely reversible through simple refund procedures.

87.    Bitcoin Depot's retention of stolen cash constitutes wrongful possession and unlawful detention of property belonging to scam victims. The company has no lawful right to possess funds obtained through fraud, regardless of whether those funds were voluntarily deposited by victims acting under duress and deception.

88.    Upon receiving notice that deposited funds were obtained through fraud—whether through direct victim complaints, police reports, or obvious transactional red flags—Bitcoin Depot becomes a knowing possessor of stolen property with actual notice of the rightful owners' superior claims to possession.

89.    Bitcoin Depot's standard practice when confronted with scam reports is to deny liability, refuse refunds, and retain the stolen funds for its own benefit. Consumer complaints document the company's consistent pattern of responses claiming "there is nothing they can do" while keeping substantial fees from fraudulent transactions.[35]

90.    Bitcoin Depot's retention of stolen funds violates fundamental principles of restitution and unjust enrichment. The company derives substantial financial benefit from criminal

---

[35] Better Business Bureau Complaints, Bitcoin Depot Operating LLC, https://www.bbb.org/us/ga/atlanta/profile/virtual-currency/bitcoin-depot-operating-llc-0443-28143445/complaints (last visited July 11, 2025).

activity while victims suffer devastating losses, creating an unconscionable disparity that the law does not permit.

91.     Bitcoin Depot has the practical ability to return stolen funds to victims, particularly the substantial fees it retains from each transaction. The company's claims of helplessness are pretextual justifications for retaining the proceeds of criminal activity.

92.     Bitcoin Depot's policy of retaining stolen cash creates perverse incentives that encourage continued criminal exploitation of its ATM network. By profiting from fraudulent transactions without consequence, the company becomes a financial beneficiary of ongoing criminal enterprise targeting vulnerable elderly consumers.

93.     Bitcoin Depot's wrongful retention of stolen property causes ongoing harm to victims who are deprived of funds needed for living expenses, medical care, and other essential needs. The company's refusal to return easily recoverable funds compounds the original harm inflicted by the underlying fraud.

94.     The cash deposits at issue belong rightfully to the victims who were defrauded, not to Bitcoin Depot or the scammers who orchestrated the theft. Bitcoin Depot's continued possession of these funds is wrongful and without legal justification.

95.     Bitcoin Depot's retention of stolen funds violates public policy by incentivizing the company to facilitate rather than prevent cryptocurrency fraud. The company's ability to profit from criminal activity without returning stolen proceeds creates a business model that depends on continued exploitation of vulnerable consumers.

## CLASS ALLEGATIONS

96.    This action is brought and may properly proceed as a class action pursuant to Civ.R.

23.

97.    Plaintiff seeks certification of the following class:

All persons who, during the Class Period, completed a cash-to-Bitcoin transaction at a Bitcoin Depot ATM located in Florida as part of an impersonation scam, and who (a) reported the fraudulent transaction to Bitcoin Depot, law enforcement, or any government agency, or (b) made such transaction under circumstances that provided Bitcoin Depot with actual or constructive notice of the fraudulent nature of the transaction.

98.    As used in the class definition:

a.    "Class Period" means the period beginning six (5) years prior to the filing of this

Complaint through the date a class certification order is entered;

b.    "Bitcoin Depot ATM located in Florida" means any Bitcoin ATM owned, operated,

maintained, or controlled by Bitcoin Depot that is physically located within the

state of Indiana;

c.    "Impersonation scam" means any fraudulent scheme where perpetrators

impersonate or falsely represent themselves as government agencies (including

IRS, Social Security Administration, Federal Reserve, or law enforcement),

technology companies (including Microsoft, Apple, or other tech support),

financial institutions, utility companies, family members in distress, romantic

interests, or other trusted entities to deceive victims into depositing cash into

Bitcoin ATMs, including all scam types that Bitcoin Depot has acknowledged or

described in its publications, SEC filings, or other communications;

d.    "Actual or constructive notice" includes circumstances where Bitcoin Depot knew

or reasonably should have known of the fraudulent nature of the transaction based

on obvious red flags such as: customers making large deposits while following telephone instructions; multiple large transactions in rapid succession by the same user; deposits to wallet addresses known to be associated with fraudulent activity; or transaction patterns consistent with known scam methodologies that Bitcoin Depot has acknowledged in its publications or SEC filings.

99.     Excluded from the Class are: (a) Bitcoin Depot and its officers, directors, employees, subsidiaries, and affiliates; (b) governmental entities; (c) any judge presiding over this action and members of their immediate families; and (d) any person who, according to Bitcoin Depot's records, executed a release of claims against Bitcoin Depot prior to the filing of this Complaint.

100.    **Numerosity** (Civ.R. 23(a)(1)): The Class is so numerous that joinder of all members is impracticable. Based on the Federal Trade Commission's findings that Bitcoin ATM fraud losses increased from $12 million in 2020 to $114 million in 2023, and that Bitcoin Depot operates at least 1,512 ATMs in Florida alone as one of the largest operators in North America, the Class likely includes hundreds or thousands of impersonation scam victims. The widespread nature of these scams, Bitcoin Depot's extensive Florida ATM network, and the company's own admissions about exploitation of its services demonstrate that the Class is sufficiently numerous. The exact number of Class members is known to Bitcoin Depot through its transaction records and complaint history but is not readily ascertainable by Plaintiff. Joinder of all Class members would be impracticable due to the large number of potential members, their geographic dispersion throughout Indiana, and the likelihood that many victims may be unaware of this litigation or reluctant to pursue individual legal action.

101.    **Commonality** (Civ.R. 23(a)(2)): There are questions of law and fact common to all Class members, including:

      a.    Whether Bitcoin Depot's business practices and safeguards constitute deceptive acts under the Indiana Deceptive Consumer Sales Act;

      b.    Whether Bitcoin Depot failed to implement reasonable measures to detect and prevent cryptocurrency ATM scams despite actual knowledge of their prevalence;

      c.    Whether Bitcoin Depot's representations about providing "safe and secure" Bitcoin ATM services were false or misleading;

      d.    Whether Bitcoin Depot voluntarily assumed a duty to protect customers from scams and breached that duty;

      e.    Whether Bitcoin Depot's conduct was negligent, grossly negligent, or reckless;

      f.    Whether Bitcoin Depot wrongfully retains cash deposited by scam victims;

      g.    The appropriateness of injunctive relief requiring Bitcoin Depot to implement effective protective measures.

102.    **Typicality** (Rule 23(a)(3)): Plaintiff's claims are typical of the claims of other Class members. Like other Class members, Plaintiff: (a) was victimized by an impersonation scam involving fraudulent representations by criminals posing as trusted entities; (b) deposited cash into a Bitcoin Depot ATM located in Florida as a direct result of the scam; (c) exhibited obvious red flags that provided Bitcoin Depot with constructive notice of the fraudulent transaction; (d) suffered financial losses when Bitcoin Depot processed the fraudulent transaction despite these warning signs; (e) reported the fraud to law enforcement, providing Bitcoin Depot with additional notice when contacted; and (f) remains harmed by Bitcoin Depot's wrongful retention of stolen funds. Plaintiff's claims arise from the same course of conduct, legal theories, and systematic

failures that affect all Class members who were victims of impersonation scams using Bitcoin Depot ATMs.

103.    **Adequacy of Representation** (Rule 23(a)(4)): Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to or in conflict with other Class members. Plaintiff has retained experienced counsel with substantial expertise in class action litigation, consumer protection law, and cases involving elder financial abuse. Plaintiff is committed to prosecuting this action vigorously and has the financial resources necessary to adequately represent the Class. Proposed Class Counsel have extensive experience in complex litigation and class actions and have successfully represented consumers in similar cases.

104.    This class action satisfies the requirements of Civ.R. 23(b)(2) because Bitcoin Depot has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Bitcoin Depot's inadequate safeguards, deceptive practices, and systematic retention of stolen funds affect all Class members uniformly, making injunctive relief requiring implementation of effective protective measures appropriate for the entire Class.

105.    This class action also satisfies the requirements of Civ.R. 23(b)(3) because:

a.    Predominance: Questions of law and fact common to Class members predominate over any questions affecting only individual members. While individual damages may vary, the core legal and factual issues regarding Bitcoin Depot's conduct, policies, and liability are common to all Class members and can be resolved on a class-wide basis.

b.  Superiority: A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to this finding include:

    i.  Class members' interests in individually controlling the prosecution of separate actions: Class members have minimal interest in individually controlling the prosecution of separate actions because: (i) individual claims are relatively small compared to litigation costs; (ii) the legal issues are identical across all claims; (iii) many Class members are elderly and may lack the resources or sophistication to pursue individual litigation; and (iv) the primary goal is industry-wide reform that benefits all consumers.

    ii.  Extent and nature of any litigation concerning the controversy already begun by or against class members: Plaintiff is not aware of any other litigation concerning the same controversy that has been commenced by or against other Class members.

    iii.  Desirability or undesirability of concentrating the litigation in the particular forum: It is desirable to concentrate this litigation in this forum because the harmful conduct occurred in Florida, Plaintiff is a Florida resident, Bitcoin Depot conducts substantial business in Florida through its extensive ATM network, and Florida has a strong interest in protecting its residents from deceptive practices and elder financial abuse.

    iv.  Likely difficulties in managing a class action: This case presents no unusual management difficulties. The Class is readily identifiable through Bitcoin Depot's transaction records, the claims arise from a common course of

conduct, and the legal theories are straightforward applications of established consumer protection principles.

106.     For all the foregoing reasons, this action satisfies all requirements of Federal Rule of Civil Procedure 23 and should be certified as a class action for both injunctive relief under Rule 23(b)(2) and monetary damages under Rule 23(b)(3).

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE FLORIDA DECEPTIVE AND
### UNFAIR TRADE PRACTICES ACT (FDUTPA)
### Fla. Stat. §§ 501.201–501.213
### (on behalf of the Plaintiff and the Class)

107.     Plaintiff incorporates by reference all previous allegations as if fully set forth herein.

108.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

109.     On June 3, 2025, Plaintiff, a 59-year-old Florida resident and consumer, was the victim of an impersonation scam. At the direction of an individual impersonating a PayPal representative who claimed Plaintiff's identity had been stolen, Plaintiff withdrew $18,100 in cash from his personal bank account and deposited these funds into Bitcoin Depot's Bitcoin ATM kiosks in two transactions occurring approximately two hours apart.

110.     Bitcoin Depot converted the deposited cash into Bitcoin and transferred it to a wallet address provided by the scammer. Bitcoin Depot retained a substantial portion of the deposited funds as transaction fees and markups, amounting to approximately $4,600 which was not transferred to the scammer but instead appropriated by Bitcoin Depot for its own use.

111. Bitcoin Depot had actual knowledge that its Bitcoin ATMs were regularly and foreseeably used as instrumentalities for impersonation scams and fraudulent activity, particularly targeting vulnerable consumers. Bitcoin Depot received numerous reports of such fraud, including direct consumer complaints and public warnings from regulatory agencies, and acknowledged on its own website that its kiosks were being used for these purposes.

112. Despite this knowledge, Bitcoin Depot failed to implement effective safeguards or operational changes to prevent the use of its ATMs in scams, and instead continued to process and profit from such transactions. Bitcoin Depot's efforts to address the regular and foreseeable use of its Bitcoin ATMs to enable scams were limited to displaying warnings and disclaimers, which Bitcoin Depot knew or should have known were ineffective in the context of impersonation scams.

113. Bitcoin Depot further misrepresented to Plaintiff and other consumers that all cash deposited into its Bitcoin ATMs was "irreversibly" exchanged for Bitcoin and transferred to the designated wallet, when in fact Bitcoin Depot retained a substantial portion of the cash as fees and continued to possess the funds after being notified of the fraud.

114. Bitcoin Depot's conduct constitutes both a deceptive act and an unfair practice under FDUTPA.

115. Bitcoin Depot's representations and omissions regarding the irreversibility of transactions, the security of its ATMs, and the nature of its services were likely to mislead a consumer acting reasonably under the circumstances, to the consumer's detriment. Plaintiff, acting as a reasonable consumer, was misled by Bitcoin Depot's practices and suffered financial harm as a result.

116. Bitcoin Depot's knowing failure to implement effective safeguards, its retention of stolen funds, and its profiting from fraudulent transactions offend established public policy and

are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Bitcoin Depot's conduct is the type of practice that the Florida Supreme Court has recognized as "unfair" because it is substantially injurious to consumers and contrary to public policy.

117.    Bitcoin Depot's deceptive and unfair acts directly and proximately caused Plaintiff's damages. Plaintiff, as a consumer, was induced to deposit $18,100 into Bitcoin Depot's ATMs under false pretenses and as a result of Bitcoin Depot's failure to implement adequate protections and its misleading representations. Bitcoin Depot's conduct was a substantial factor in causing Plaintiff's loss.

118.    As a direct and proximate result of Bitcoin Depot's violations of FDUTPA, Plaintiff suffered actual damages, including but not limited to the loss of $18,100 and the deprivation of the benefit of his property, as well as the retention of approximately $4,600 by Bitcoin Depot as transaction fees and markups.

119.    Plaintiff is a consumer aggrieved by Bitcoin Depot's deceptive and unfair acts and practices and is entitled to recover actual damages, attorney's fees, and court costs pursuant to Fla. Stat. § 501.211(2), and to seek injunctive and declaratory relief as appropriate.

## COUNT TWO
## CIVIL THEFT FOR POSSESSION OF STOLEN PROPERTY
### Fla. Stat. §§ 812.012–812.037
**(on behalf of the Plaintiff and the Class)**

120.    Plaintiff incorporates by reference all previous allegations as if fully set forth herein.

121.    On June 3, 2025, Plaintiff was the victim of a sophisticated impersonation scam. At the direction of an individual impersonating a PayPal representative who claimed Plaintiff's identity had been stolen, Plaintiff withdrew a total of $18,100 in cash from his personal bank

account and deposited these funds into Bitcoin Depot's Bitcoin ATM kiosks in two transactions occurring approximately two hours apart.

122.    The cash deposited by Plaintiff was converted by Bitcoin Depot into Bitcoin and transferred to a wallet address provided by the scammer. Bitcoin Depot retained a substantial portion of the deposited funds as transaction fees and markups, amounting to approximately $4,600, which was not transferred to the scammer but instead appropriated by Bitcoin Depot for its own use.

123.    Bitcoin Depot had actual knowledge that its Bitcoin ATMs were regularly and foreseeably used as instrumentalities for impersonation scams and fraudulent activity, particularly targeting vulnerable individuals. Bitcoin Depot received numerous reports of such fraud, including direct consumer complaints and public warnings from regulatory agencies, and acknowledged on its own website that its kiosks were being used for these purposes. Despite this knowledge, Bitcoin Depot failed to implement effective safeguards or operational changes to prevent the use of its ATMs in scams, and instead continued to process and profit from such transactions.

124.    Bitcoin Depot's conduct in retaining the transaction fees and refusing to return the portion of the funds it appropriated constitutes knowing use and possession of stolen property.

125.    Bitcoin Depot acted with felonious intent, as evidenced by its willful retention of the proceeds of the stolen funds, its knowledge of the fraudulent nature of the transactions, and its refusal to return the appropriated funds to Plaintiff after being notified of the fraud. Bitcoin Depot's actions were intended to deprive Plaintiff of his right to and benefit from his property, and to appropriate the property to its own use.

126.    As a direct and proximate result of Bitcoin Depot's conduct, Plaintiff was permanently deprived of the benefit of his property, and Bitcoin Depot was unjustly enriched by the proceeds of the theft.

127.    Plaintiff is entitled to recover treble damages, attorney's fees, and costs pursuant to Fla. Stat. § 772.11.

**COUNT THREE**
**NEGLIGENCE**
**(on behalf of the Plaintiff and the Class)**

128.    Plaintiff incorporates by reference all previous allegations as if fully set forth herein.

129.    At all relevant times, Bitcoin Depot operated a network of Bitcoin ATM kiosks accessible to the general public, including vulnerable consumers such as Plaintiff. By placing and operating these kiosks in public locations and inviting consumers to use them for substantial financial transactions, Bitcoin Depot owed a legal duty to exercise reasonable care in the design, operation, and monitoring of its ATMs. This duty arose because Bitcoin Depot's conduct foreseeably created a "zone of risk" that posed a general threat of harm to users, including the risk of financial loss due to impersonation scams and fraudulent activity. Bitcoin Depot's own public statements and regulatory filings acknowledge that its ATMs were regularly and foreseeably used as instrumentalities for such scams, particularly targeting vulnerable individuals.

130.    Bitcoin Depot breached its duty of care by failing to implement reasonable and effective safeguards to prevent foreseeable harm to users of its Bitcoin ATMs. Despite actual and constructive knowledge that its kiosks were being exploited by scammers to facilitate impersonation and financial fraud, Bitcoin Depot failed to:

    a.    Implement transaction limits for new or first-time users;

b.  Require robust identity verification or additional authentication for large or unusual transactions;

c.  Institute holding periods or review protocols for suspicious transactions;

d.  Employ effective transaction monitoring or fraud detection systems; and

e.  Take meaningful action in response to repeated reports of fraud and regulatory warnings.

131.  Instead, Bitcoin Depot's efforts were limited to displaying passive warnings and disclaimers on ATM screens, which Bitcoin Depot knew or should have known were ineffective in the context of impersonation scams, where victims are often under duress and acting at the direction of professional criminals.

132.  As a direct and proximate result of Bitcoin Depot's breach of its duty of care, Plaintiff suffered substantial financial harm.

133.  On June 3, 2025, Plaintiff was deceived by an impersonator posing as a PayPal representative who claimed Plaintiff's identity had been stolen. Acting under the belief that he was protecting his accounts from fraudulent activity, Plaintiff withdrew $18,100 in cash from his personal bank account and deposited these funds into Bitcoin Depot's Bitcoin ATMs in two transactions occurring approximately two hours apart, which then transferred the funds to the scammer's Bitcoin wallet. Bitcoin Depot's failure to implement reasonable safeguards was a substantial factor in enabling the scam to succeed and in causing Plaintiff's loss. Had Bitcoin Depot adopted industry-standard protections or responded appropriately to the known risk, the harm to Plaintiff would have been prevented or mitigated.

134.  As a result of Bitcoin Depot's negligence, Plaintiff suffered actual damages, including but not limited to the loss of $18,100 in cash, emotional distress, and the deprivation of

the use and benefit of his property. Bitcoin Depot also retained a substantial portion of Plaintiff's funds as transaction fees and markups, further compounding Plaintiff's losses.

## COUNT FOUR
## VOLUNTARY ASSUMPTION OF A DUTY

135.    Plaintiff incorporates by reference all previous allegations as if fully set forth herein.

136.    Defendant Bitcoin Depot voluntarily and gratuitously assumed a duty of care to protect its customers, including Plaintiff, from cryptocurrency scams and fraud through affirmative conduct that created a special relationship and imposed a corresponding duty to act reasonably.

137.    Defendant specifically undertook customer protection responsibilities through deliberate actions, not legal mandates, including:

    a.    Representing that it employs "various measures to protect customers from scams and fraud" and provides "safe and secure Bitcoin ATM services";

    b.    Creating and publishing extensive educational materials, including dedicated webpages titled "Common Crypto Scams" and "12 Days of Bitcoin #8 - Eight Bitcoin ATM Scams";

    c.    Implementing scam detection and warning systems by posting "scam warnings on all kiosks" and prompting customers about common scams;

    d.    Representing that "customer support staff [are] readily available to address questions or concerns about potential transactions";

    e.    Employing "security measures to protect its Bitcoin ATMs from tampering and other types of fraud"; and

    f.    Acknowledging that vulnerable consumers are susceptible to cryptocurrency scams and publishing targeted educational content about scam tactics.

138.    These undertakings were voluntary competitive advantages and marketing features, not mere legal compliance.

139.    Defendant's failure to exercise reasonable care in performing its voluntarily assumed duties increased the risk of harm to Plaintiff beyond what would have existed without the undertaking. By creating false marketplace security that made Bitcoin ATMs appear safer than they actually were, Defendant contributed to industry perceptions of meaningful fraud protections while failing to implement adequate safeguards. Defendant implemented demonstrably ineffective warnings that provided justification for processing obviously fraudulent transactions and held itself out as knowledgeable about fraud patterns while failing to utilize such expertise to protect vulnerable customers.

140.    Defendant breached its voluntarily assumed duty by failing to exercise reasonable care in performing its specific protective undertakings. Despite undertaking to provide effective scam warnings, Defendant implemented only superficial warnings that it knew were ineffective. Despite representing readily available customer support, Defendant failed to intervene when Plaintiff exhibited obvious signs of distress and fraudulent manipulation. Despite undertaking security measures against fraud, Defendant failed to implement transaction monitoring for obvious patterns like customers making large sequential deposits totaling $18,100 within two hours while following telephone instructions. Despite assuming duties to educate customers about scam patterns, Defendant failed to provide effective education that would have prevented Plaintiff's victimization. Despite acknowledging consumer vulnerability to impersonation scams, Defendant failed to implement protections for vulnerable customers like Plaintiff.

141.    Defendant's breach was systematic, as evidenced by ongoing consumer complaints documenting similar failures with other vulnerable customers.

142.    Defendant's breach of its voluntarily assumed protective duties was the proximate cause of Plaintiff's injuries. But for Defendant's breach, Plaintiff's losses would not have occurred, as reasonable performance of assumed warning, monitoring, and customer support duties would have detected and prevented the fraudulent scheme.

143.    The harm suffered by Plaintiff was precisely the foreseeable consequence that Defendant's assumed protective duties were intended to prevent, as evidenced by Defendant's own publications identifying the exact scam pattern that victimized Plaintiff.

144.    As a direct and proximate result of Defendant's breach of its voluntarily assumed duties, Plaintiff suffered compensable injuries including actual financial losses of $18,100, loss of use of funds needed for essential expenses, emotional distress from financial exploitation, and incidental damages from attempting to recover stolen funds.

### COUNT FIVE
### UNJUST ENRICHMENT
**(on behalf of the Plaintiff and the Class)**

145.    Plaintiff incorporates by reference all previous allegations as if fully set forth herein.

146.    On June 3, 2025, Plaintiff, a 59-year-old Florida resident, was the victim of an impersonation scam. At the direction of an individual impersonating a PayPal representative who claimed Plaintiff's identity had been stolen, Plaintiff withdrew $18,100 in cash from his personal bank account and deposited these funds directly into Bitcoin Depot's Bitcoin ATM kiosks in two transactions occurring approximately two hours apart.

147.    By depositing cash into Bitcoin Depot's ATMs, Plaintiff directly conferred a substantial benefit upon Bitcoin Depot. Specifically, Bitcoin Depot retained approximately $4,600

of Plaintiff's funds as transaction fees and markups, which were not transferred to the scammer but instead appropriated by Bitcoin Depot for its own use.

148.    Bitcoin Depot had actual knowledge of the benefit conferred by Plaintiff. Bitcoin Depot's business model is based on collecting transaction fees and markups from users of its Bitcoin ATMs, and Bitcoin Depot's own records reflect the receipt and retention of Plaintiff's funds. Bitcoin Depot was aware that the cash deposited by Plaintiff was used to purchase Bitcoin at a significant markup, and that a substantial portion of the funds was retained by Bitcoin Depot as profit.

149.    Bitcoin Depot voluntarily accepted and retained the benefit conferred by Plaintiff. Despite being notified that the funds were the product of a scam and that Plaintiff was a victim of fraud, Bitcoin Depot did not return the retained portion of the funds to Plaintiff. Instead, Bitcoin Depot continued to possess and use the funds for its own benefit.

150.    The circumstances surrounding Bitcoin Depot's retention of the benefit are inequitable. Bitcoin Depot had actual and constructive knowledge that its Bitcoin ATMs were regularly and foreseeably used as instrumentalities for impersonation scams and fraudulent activity, particularly targeting vulnerable consumers. Bitcoin Depot received numerous reports of such fraud, including direct consumer complaints and public warnings from regulatory agencies, and acknowledged on its own website that its kiosks were being used for these purposes.

151.    Despite this knowledge, Bitcoin Depot failed to implement effective safeguards or operational changes to prevent the use of its ATMs in scams, and instead continued to process and profit from such transactions. Bitcoin Depot's efforts to address the regular and foreseeable use of its Bitcoin ATMs to enable scams were limited to displaying warnings and disclaimers, which Bitcoin Depot knew or should have known were ineffective in the context of impersonation scams.

152.    Bitcoin Depot's retention of the benefit conferred by Plaintiff is unjust and inequitable under these circumstances. Bitcoin Depot's knowing failure to implement effective safeguards, its retention of stolen funds, and its profiting from fraudulent transactions offend established public policy and are substantially injurious to consumers. It would be inequitable for Bitcoin Depot to retain the benefit of Plaintiff's funds without returning the fair value to Plaintiff, especially after being notified of the fraudulent nature of the transaction.

153.    As a direct and proximate result of Bitcoin Depot's unjust enrichment, Plaintiff suffered actual damages, including but not limited to the loss of $18,100 and the deprivation of the benefit of his property, as well as the retention of approximately $4,600 by Bitcoin Depot as transaction fees and markups.

**PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff Kevin Shamy, on behalf of himself and all others similarly situated, requests judgment in their favor against Defendants Bitcoin Depot, Inc. and Bitcoin Depot Operating, LLC as follows:

A.    Certifying this action as a Class Action on behalf of the Class as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's Counsel as counsel for the Class;

B.    Awarding Plaintiff and Class members all nominal, statutory, actual, compensatory, consequential, incidental, and enhanced damages, as well as restitution and disgorgement as allowed by law or equity;

C.    Awarding Plaintiff and Class members all pre- and post-judgment interest;

D.    Awarding Plaintiff and Class members all reasonable attorneys' fees, expenses, and costs; and

E.  Granting such other relief as the Court deems just and appropriate.

## **<u>JURY DEMAND</u>**

Plaintiff Kevin Shamy respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,

<u>/s/ Michael A. Smith, Jr.</u>
Michael A. Smith, Jr. (FL Bar #1061760)
Brian D. Flick (OH #0081605)*
Marita I. Ramirez (OH #0110882)*
*Pro Hac Vice Application Anticipated*
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
Phone: 216-373-0539
Fax: 216-373-0536
msmith@dannlaw.com
notices@dannlaw.com
*Attorneys for Plaintiff Kevin Shamy*
*and the putative class*